IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Kathleen L.,[1]                        )     C/A No.: 1:23-1391-SVH
                                       )
                Plaintiff,             )
                                       )
        vs.                            )
                                       )              ORDER
Kilolo Kijakazi, Acting                )
Commissioner of Social Security        )
Administration,                        )
                                       )
                Defendant.             )
                                       )
_____        )

This appeal from a denial of social security benefits is before the court
for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B)
(D.S.C.), and the order of the Honorable Mary Geiger Lewis, United States
District Judge, dated May 15, 2023, referring this matter for disposition.
[ECF No. 6]. The parties consented to the undersigned United States
Magistrate Judge's disposition of this case, with any appeal directly to the
Fourth Circuit Court of Appeals. [ECF No. 5].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social
Security Act ("the Act") to obtain judicial review of the final decision of the
Commissioner of Social Security ("Commissioner") denying the claim for
disability insurance benefits ("DIB") and Supplemental Security Income

_____
[1] The Committee on Court Administration and Case Management of the
Judicial Conference of the United States has recommended that, due to
significant privacy concerns in social security cases, federal courts should
refer to claimants only by their first names and last initials.

("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.     Relevant Background

    A.     Procedural History

On March 19, 2019, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on January 1, 2017. Tr. at 75, 76, 200–24, 225–28. Her applications were denied initially and upon reconsideration. Tr. at 125–28, 129–32, 135–40, 141–46. On September 11, 2020, Plaintiff had a hearing by telephone before Administrative Law Judge ("ALJ") Ronald Sweeda. Tr. at 29–42 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 28, 2020, finding Plaintiff was not disabled within the meaning of the Act. Tr. at 9–28. Subsequently, the Appeals Council denied Plaintiff's request for review. Tr. at 1–6.

On March 28, 2022, the court issued an order adopting the report and recommendation and reversing and remanding the case for further administrative proceedings. Tr. at 867–913. The Appeals Council issued an order remanding the case to the ALJ on June 28, 2022. Tr at 915–19. The ALJ held a second hearing by telephone on December 6, 2022. Tr. at 827–40.

He issued a partially-favorable decision on December 23, 2022, finding Plaintiff was not disabled prior to April 18, 2021, but became disabled on that date. Tr. at 796–826. Plaintiff declined to file written exceptions to the ALJ's decision, making the decision final on February 22, 2023. Tr. at 787. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 6, 2023. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 54 years old at the time of the first hearing and 56 years old at the time of the second hearing. Tr. at 32, 831. She attended school through the ninth grade. Tr. at 831. She has no past relevant work ("PRW"), as her prior work was not considered substantial gainful activity ("SGA"). *Id.* She alleges she has been unable to work since January 1, 2017. Tr. at 225.

2.    Medical History

Plaintiff presented to the emergency room ("ER") at Roper Hospital on January 4, 2017. Tr. at 417. She complained of pain in her back, left knee, and left hand due to a car accident three days prior. *Id.* X-rays of Plaintiff's lumbar spine showed mild degenerative changes, including mild disc space narrowing at L2–3, with findings somewhat like a 2013 exam. Tr. at 416. Edward Rodelssperger, M.D., diagnosed acute low-back pain, contusion, and

motor vehicle collision and discharged Plaintiff with prescriptions for Parafon Forte DSC 500 mg and Diclofenac Sodium 75 mg. Tr. at 419.

Plaintiff presented to physician assistant Jennifer L. Willett ("PA Willett") with complaints of neck and back pain on January 27, 2017. Tr. at 513. She reported having injured her neck and back in a car accident on January 1 and noted her symptoms had not improved. *Id.* She said her pain ranged from a six to a 10 on a 10-point scale and increased with prolonged sitting or walking. *Id.* NP Willett observed tenderness to palpation ("TTP"), normal strength, and full range of motion ("ROM") of the lumbar and cervical spines. *Id.* She found no edema and intact sensation and deep tendon reflexes ("DTRs") in Plaintiff's upper and lower extremities. *Id.* She assessed acute bilateral back pain without sciatica, neck pain, and motor vehicle collision injuring restrained driver. Tr. at 514. She prescribed a Medrol Dosepak and indicated Plaintiff could continue to use Flexeril as needed. *Id.* She recommended heat and massage and referred Plaintiff to physical therapy. *Id.*

Plaintiff presented to James Island Physical Therapy for an initial evaluation on February 1, 2017. Tr. at 551. She complained of cervical and lumbar pain. *Id.* Physical therapist Brandon C. Duffie ("PT Duffie") observed Plaintiff to demonstrate cervical ROM grossly decreased by 10 degrees with some pain, lumbar ROM grossly decreased by 20+ degrees, passive ROM of

the bilateral hips grossly decreased by five to 10 degrees, 4/5 bilateral upper and lower extremity strength secondary to pain, and decreased bilateral lower extremity flexibility. Tr. at 552. He considered Plaintiff to have good rehabilitation potential and recommended two physical therapy sessions per week for three to four weeks. *Id.* Physical therapy assistant Rachel Marozzi recommended an additional four weeks of physical therapy on February 24, 2017. Tr. at 568.

Plaintiff participated in physical therapy from February 3, through April 17, 2017. Tr. at 529–50. She often complained of pain that limited her activities of daily living ("ADLs") and ability to perform physical therapy exercises, but showed some improvement in lumbar ROM. *See id.*; Tr. at 559.

On February 27, 2017, Plaintiff complained of neck pain with radiation to her left arm and low-back pain with radiation around the front and to her hips. Tr. at 509. She denied making progress through physical therapy and reported incomplete relief with medications. *Id.* PA Willett noted she had prescribed a Medrol taper and Flexeril as needed and had subsequently prescribed Etodolac after Plaintiff reported ongoing pain. *Id.* She observed TTP in Plaintiff's lumbar and cervical spines with normal strength, full ROM, and intact sensation and DTRs. *Id.* She prescribed Flexeril 20 mg three times a day as needed and ordered magnetic resonance imaging ("MRI") of the lumbar and cervical spines. Tr. at 510–11.

On March 6, 2017, an MRI showed a bulge with mild ventral cord flattening and severe right and moderately-severe left foraminal stenosis at C5–6, as well as an annular bulge with mild ventral cord flattening and moderate left foraminal stenosis at C6–7. Tr. at 412–14. It further indicated minimal lumbar degenerative changes without disc herniation or stenosis. *Id.*

Plaintiff endorsed pain and indicated she was making little progress with physical therapy on March 24, 2017. Tr. at 505. She indicated she had not yet followed up with the neurosurgeon due to cost. *Id.* PA Willett recorded TTP of the cervical and lumbar spines with normal strength and ROM to both. *Id.* She indicated she had done all she could from a primary care standpoint for Plaintiff's cervical spinal stenosis and that neurosurgical consultation was required. Tr. at 506.  She refilled Flexeril and Etodolac and encouraged smoking cessation. Tr. at 506–07.

On April 19, 2017, PT Duffie indicated Plaintiff was performing all therapy exercises, would be seeing an orthopedist for further evaluation, and should continue physical therapy according to the plan. Tr. at 528.

On April 27, 2017, Thomas Steele, M.D. ("Dr. Steele"), noted Plaintiff was smoking roughly five cigarettes per day and occasionally binge drinking, but that it did not seem to be causing any problems. Tr. at 666. He noted Plaintiff's mental functioning was stable and improved with her current regimen. *Id.* He continued Plaintiff on Effexor XR 150 mg daily and two-and-

a-half Buspirone 15 mg twice a day. *Id.* Plaintiff's diagnoses included depressive disorder, not otherwise specified, and unspecified anxiety state. *Id.*

Plaintiff complained of severe right hip pain on June 1, 2017. Tr. at 628. Pain management specialist Shailesh M. Patel ("Dr. Patel"), noted bilateral paracervical tenderness, limited ROM of the cervical spine, positive seated straight-leg raise ("SLR") on the right, antalgic gait, painful ROM of the lumbar spine, and decreased sensation of the right knee, medial and lateral leg, and dorsum of the foot. *Id.* He recommended diagnostic and therapeutic lumbar epidural steroid injections ("ESIs") and electromyography ("EMG") and nerve conduction studies ("NCS") of the lower extremities. *Id.*

On June 15, 2017, an MRI of Plaintiff's right hip demonstrated mild degenerative fraying of the right acetabular labrum and trace patchy bone marrow edema along the sacral and iliac aspect of both sacroiliac ("SI") joints, suggesting active degeneration versus mild sacroiliitis. Tr. at 647.

On June 27, 2017, Dr. Patel administered right L4–5 and L5–S1 transforaminal ESIs. Tr. at 636–37.

Plaintiff complained of pain in her cervical and lumbar spines on July 11, 2017. Tr. at 624. She endorsed good relief of sciatica-related pain, but continued moderate SI joint pain. Tr. at 625. Dr. Patel observed tenderness of the bilateral paracervicals, cervical ROM limited by pain, positive SLR on the

right, antalgic gait, painful ROM of the lumbar spine, and decreased sensation of the right knee, medial and lateral leg, and dorsum of the foot. *Id.* He ordered SI joint injections. *Id.*

Dr. Patel administered bilateral SI joint injections on July 21, 2017. Tr. at 634–35.

On August 3, 2017, Plaintiff described pain radiating from her lumbar spine to her right thigh as a 10. Tr. at 621. She indicated SI joint injections had provided no relief. *Id.* Dr. Patel noted bilateral paracervical tenderness, cervical ROM limited by pain, positive seated SLR on the right, pain with ROM of the lumbar spine, and decreased sensation to the right knee, medial and lateral leg, and dorsum of the foot. Tr. at 621–22. EMG and NCS were normal. Tr. at 641–42. He prescribed Norco 7.5‑325 mg twice a day and ordered additional physical therapy. Tr. at 622.

Plaintiff described pain as a seven radiating from her lumbar spine to her right thigh on September 5, 2017. Tr. at 618. She reported physical therapy had provided no significant improvement. Tr. at 619. Dr. Patel observed bilateral paracervical tenderness, limited ROM of the cervical spine due to pain, positive seated SLR test on the right, painful ROM of the lumbar spine, and decreased sensation of the right knee, medial and lateral leg, and dorsum of the foot. Tr. at 618–19. He recommended holding off on further

physical therapy and scheduled Plaintiff for lumbar facet injections. Tr. at 619. He continued Plaintiff's prescription for Norco 7.5-325 mg. *Id.*

Dr. Patel administered bilateral lumbar facet joint injections at Plaintiff's L4–5 and L5–S1 levels on October 6, 2017. Tr. at 630.

Plaintiff rated pain from her lumbar spine to her right thigh as a nine on October 31, 2017. Tr. at 614, 615. Dr. Patel observed bilateral paracervical tenderness, limited ROM of the cervical spine due to pain, antalgic gait, positive seated SLR on the right, painful ROM of the lumbar spine, and decreased sensation in the right knee, medial and lateral leg, and dorsum of the foot. Tr. at 615–16. He noted Plaintiff had received no lasting relief from spinal injections. Tr. at 616. He refilled Plaintiff's medications and ordered a new MRI of the lumbar spine. *Id.*

On November 2, 2017, Plaintiff complained of back and leg pain and reported sleeping for roughly six hours per night. Tr. at 662. Dr. Steele described Plaintiff as "careworn" and indicated her mood was "[n]ot clearly depressed, but somewhat annoyed at persistent pain with appropriate reactivity." *Id.* He recommended an increased dose of Effexor, but Plaintiff preferred to maintain her current regimen. *Id.*

On November 15, 2017, an MRI of Plaintiff's lumbar spine showed mild mid-lumbar spondylosis with no significant stenoses. Tr. at 638.

Plaintiff described pain as a seven radiating from her lumbar spine to her right thigh during a pain management visit on November 20, 2017. Tr. at 610. She reported injections had provided about 50% pain relief. Tr. at 612. Physician assistant Kathleen D. Bukowsky ("PA Bukowsky") observed bilateral paracervical tenderness, limited ROM of the cervical spine due to pain, antalgic gait, pain with motion of the lumbar spine, and decreased sensation of the right knee and medial leg and the dorsum of the right foot. *Id.* She recommended additional therapy, ordered a spinal brace, and prescribed Gabapentin 300 mg. *Id.*

Plaintiff described pain as a seven in her lumbar spine radiating to her right thigh on January 2, 2018. Tr. at 607, 608. PA Bukowsky observed bilateral paracervical tenderness, limited ROM of the cervical spine, positive SLR on the right, antalgic gait, pain with motion of the lumbar spine, and decreased sensation of the right knee and medial and lateral leg and the dorsum of the right foot Tr. at 609. She indicated Plaintiff had reported 50% relief from SI and facet joint injections and no relief from physical therapy and an SI belt. *Id.* She further noted Plaintiff represented she was taking her medication three times a day, but had not filled her prescriptions since November 13. *Id.* She refilled Norco 7.5-325 mg and replaced Gabapentin with Lyrica 75 mg, as Plaintiff complained that Gabapentin was not beneficial and made her feel "loopy." *Id.*

Plaintiff rated her pain as a nine on February 5, 2018. Tr. at 604. She described pain in her lumbar spine that radiated to her right thigh and caused weakness. Tr. at 605. Dr. Patel noted tenderness of the bilateral paracervical muscles, cervical ROM limited by pain, positive seated SLR, antalgic gait, pain with motion of the lumbar spine, and decreased sensation of the knee and medial leg in the L4 dermatome and on the lateral leg and dorsum of the foot in the L5 dermatome. Tr. at 606. He indicated he had no further treatment options to offer Plaintiff, as the MRI showed no significant herniation or edema and she reported little lasting relief from spinal injections. *Id.* Dr. Patel assessed lumbosacral radiculitis, lumbar radiculopathy, and long-term drug therapy and prescribed Norco 7.5-325 mg, Mobic 15 mg, and Flexeril 10 mg. *Id.* He indicated Plaintiff desired to follow up with a neurologist for a second opinion. *Id.*

Plaintiff complained of back and neck pain, but endorsed relatively good mood on March 22, 2018. Tr. at 660. Dr. Steele described Plaintiff as "careworn," but otherwise noted normal findings on exam. *Id.* He considered Plaintiff's depression to be in remission and refilled Effexor. *Id.*

Plaintiff presented to neurosurgeon James M. Highsmith, M.D. ("Dr. Highsmith"), for an initial consultation on May 1, 2018. Tr. at 730–31. She described a sharp, stabbing sensation in her low back that radiated into her right anterior thigh and bilateral groins and rated it as a seven to eight. Tr.

at 730. She noted it was worsened by prolonged standing and sitting and ADLs. *Id.* Dr. Highsmith recorded 5/5 musculoskeletal strength, 2/4 DTRs, sensation intact to pinprick and light touch, TTP of the lumbar paraspinous muscles with palpable muscle spasm, trigger points in the right and left quadratus lumborum, tenderness at the midline from L3 to S1 with limited ROM and pain at the endpoints, and positive SLR on the right at 60 degrees. Tr. at 731. He assessed axial low back pain and bilateral lower extremity radiculopathy, as well as lumbar disc disruption at L2 through L5. *Id.* He prescribed Diclofenac 75 mg twice a day and physical therapy with a home exercise regimen. *Id.*

On June 5, 2018, Plaintiff described severe pain that radiated from her low back to her right anterior thigh and groin, causing her legs to tire, difficulty stopping while walking, and increased discomfort with prolonged sitting and standing. Tr. at 732. Dr. Highsmith noted 5/5 musculoskeletal strength, intact sensation to light touch and pinprick, moderate TTP of the lumbar paraspinous muscles with palpable muscle spasms present, trigger points in the right and left quadratus lumborum, mild tenderness at the midline from L3 to S1 with limited ROM and pain at the endpoints, and positive SLR on the right at 45 degrees. *Id.* He suspected Plaintiff's pain was coming from the L2–3 level and felt Plaintiff would benefit from an ESI and posterior decompression at this level. Tr. at 733.

On July 5, 2018, Dr. Steele described Plaintiff's mood as "stable" and "not bad considering continuation of chronic pain." Tr. at 654. He indicated Plaintiff had some demoralization and was not "really engaging in potentially-pleasurable activities" because "almost any activity [was] painful." *Id.* He observed Plaintiff to demonstrate a "somewhat labored" gait and to have appropriate mood without depressive thought content. *Id.* He noted Plaintiff was psychiatrically stable and continued Effexor. *Id.*

On August 14, 2018, Plaintiff reported little to no relief of symptoms from the L2–3 ESI. Tr. at 734. She complained of difficulty standing upright and hunching forward and significant discomfort that increased upon prolonged sitting and standing and engaging in ADLs. *Id.* Dr. Highsmith noted 4/5 strength in Plaintiff's bilateral hip flexors, diminished sensation in the bilateral anterior thighs, and positive SLR at 30 degrees on the right and 60 degrees on the left. Tr. at 735. Because of Plaintiff's "persistent symptoms and progressive neurologic decline," he recommended she undergo posterior decompression at L2–3. *Id.*

Plaintiff returned to Dr. Highsmith for a surgical follow up visit on September 4, 2018. Tr. at 736. She reported some improvement in her hip pain, but complained of continued axial pain that radiated into the top of her thigh, persistent pain, and some swelling. *Id.* Dr. Highsmith observed 4/5 strength in the bilateral hip flexors, diminished sensation in the bilateral

anterior thighs, and moderate swelling around the surgical incision with no erythema or drainage. Tr. at 736, 737. Plaintiff was severely tender at the midline from L2 to S1 with limited ROM and pain at the endpoints. *Id.* Dr. Highsmith recommended continued use of topical treatments with hot and cold therapy and a trial of Valium. *Id.* He also prescribed Ultram and instructed Plaintiff to continue to limit her activity. *Id.*

Plaintiff reported improved and less steady pain in her right hip on October 8, 2018. Tr. at 738. She described a cramping sensation radiating into her right hip and anterior thigh that was precipitated by prolonged standing. *Id.* She also complained that muscle spasms were keeping her up at night. *Id.* Dr. Highsmith noted 4+/5 bilateral musculoskeletal strength, improved sensation in the right anterior thigh, a well-healing incision to Plaintiff's lumbar spine with moderate TTP of the lumbar paraspinous muscles, palpable muscle spasms, trigger points in the right and left quadratus lumborum, and moderate tenderness at the midline from L2 to L5 with limited ROM and pain at the endpoints. Tr. at 738–39. He refilled Valium, continued Ultram, added Diclofenac 75 mg, and recommended physical therapy for low back strengthening. *Id.*

On December 13, 2018, Plaintiff reported she had run out of Effexor four days prior and had been taking the medication on alternate days, which led to some sensory withdrawal symptoms. Tr. at 652. She indicated her

mood was "as good as can be expected," given her chronic back and hip pain. *Id.* Dr. Steele observed Plaintiff to be "[l]ooking somewhat more careworn" with labored gait and some mood reactivity without frank depression. *Id.* He instructed Plaintiff to resume Effexor XR 150 mg. *Id.*

On December 18, 2018, Plaintiff reported improvement of radiating anterior thigh pain, but described a slowly crippling sensation of low-back pain into the groin that appeared to be related to the position in which she held her hip. Tr. at 740. She indicated a constant, dull, and aching sensation that reached pain levels of eight and nine. *Id.* Dr. Highsmith noted 4+/5 bilateral musculoskeletal strength, intact sensation to light touch and pinprick, moderate TTP of the lumbar paraspinous muscles with palpable muscle spasms, trigger points in the right and left quadratus lumborum, mild tenderness at the midline from L3 to S1 with limited ROM and pain at the endpoints, positive FABER test on the right, and negative SLR. Tr. at 740–41. He prescribed Diclofenac and Flexeril and ordered an MRI of Plaintiff's right hip. Tr. at 741.

During a six-month follow up visit with Richard Ulmer, M.D. ("Dr. Ulmer"), on January 30, 2019, Plaintiff endorsed back pain that prevented her from standing for longer than one hour. Tr. at 650–51.

Plaintiff complained of significant pain between the hip, lumbar spine, and SI joint on February 5, 2019. Tr. at 742. Dr. Highsmith noted the MRI

showed some fraying of the cartilage in Plaintiff's right acetabulum. *Id.* He observed positive SI joint tenderness on the right and findings consistent with prior exams. Tr. at 742–43. He recommended pain management and possible radiofrequency ablation in the hip, SI joint, and lumbar spine. Tr. at 743.

On May 30, 2019, Plaintiff complained of being depressed, but Dr. Steele noted "this actually seems to be dysphoria related to pain." Tr. at 1037. Dr. Steele described Plaintiff as "slightly less careworn than at previous visit," but noted her gait was somewhat labored and her mood was slightly constricted, but not clearly depressed, with some reactivity. *Id.* He stated Plaintiff's depression seemed to be controlled, but her major problem was dysphoria from chronic pain. *Id.* He refilled Effexor HCl ER 150 mg, recommended an acupuncture evaluation, and indicated he would consider a referral to a chronic pain management program. *Id.*

On June 17, 2019, x-rays of Plaintiff's right hip showed mild joint narrowing on the right side and moderate joint narrowing on the left side, with shallow osteophytes. Tr. at 786.

Cashton B. Spivey, Ph.D. ("Dr. Spivey"), conducted a consultative psychological evaluation of Plaintiff on June 26, 2019. Tr. at 788–90. Plaintiff endorsed spinal and right hip pain. Tr. at 788. Dr. Spivey observed Plaintiff to walk slowly and with a limp. *Id.* Plaintiff reported feelings of dysphoria

related to physical pain and limitations. *Id.* She endorsed sleep disturbance, fluctuating appetite, low energy, and daily crying spells, but denied attention/concentration problems, suicidal and homicidal ideation, paranoid ideation, and auditory or visual hallucinations. Tr. at 788–89. She reported fluctuating feelings of anxiety and ruminations. Tr. at 789. She stated she was capable of loading and unloading the dishwasher, dusting, and sweeping on a good day. *Id.* She indicated she and her roommate shopped for groceries. *Id.* She described engaging in home physical therapy exercises, taking medication, eating meals, watching television, and interacting with her roommate during a typical day. *Id.* Dr. Spivey noted Plaintiff scored 23 of 30 points on the Mini-Mental State Examination, consistent with mild cognitive difficulties. *Id.* He indicated Plaintiff's inability to recall any of three objects at five minutes suggested impairment to her short-term auditory memory functioning. *Id.* He noted Plaintiff's mood was mildly sad, but she remained pleasant. *Id.* He stated Plaintiff's attention was fair and her concentration ranged from fair to poor. *Id.* He observed Plaintiff to alternate between sitting and lying down and indicated she appeared to display a low energy level. Tr. at 790. He diagnosed unspecified depressive disorder and unspecified anxiety disorder. *Id.* He considered Plaintiff capable of managing her own funds and understanding simple instructions and performing simple tasks in the workplace. *Id.*, Based on behavioral observations during the

17

assessment, Dr. Spivey opined that Plaintiff would display problems with stamina, but not persistence, in the workplace. *Id.*

Plaintiff presented to Kerri Kolehma, M.D. ("Dr. Kolehma"), for a consultative medical evaluation on July 11, 2019. Tr. at 792–95. She complained of pain in her right hip and leg. Tr. at 792. She noted pain in her right hip and buttocks increased upon standing and radiated into her groin and down her leg to the knee. *Id.* She indicated the pain increased upon walking and performing motions required for sleeping and turning. *Id.* She reported surgery had helped her upper back pain, but had not helped the pain in her right buttock, groin, and hip. *Id.* She endorsed recent use of a cane. *Id.* She reported abilities to sit for about 10 minutes, stand for about 10 minutes, and walk for five to 10 minutes. Tr. at 792.

Dr. Kolehma observed Plaintiff to ambulate with a cane, leaning through with a moderate amount of pressure. Tr. at 793. She noted Plaintiff sat comfortably and had no problems getting in and out of the chair. *Id.* She noted TTP of Plaintiff's right hip over the gluteus maximus, gluteus medius, and trochanteric bursa. Tr. at 794. She indicated Plaintiff had pain with internal and external rotation and hip flexion. *Id.* She noted loss of lumbar lordosis and ROM of the lumbar and cervical spines within functional limits. *Id.* She described Plaintiff's gait as antalgic with decreased stance phase through the right lower extremity and indicated walking on her heels and

toes increased the pain in her right hip. *Id.* She recorded 5/5 strength, except for 4/5 strength in the right hip. *Id.* She noted Plaintiff gave way secondary to pain. *Id.* She recorded 2+, equal, and symmetric reflexes and negative SLR in the seated and supine positions. *Id.* She reported no conflicting evidence or inconsistencies during the exam. *Id.*

Dr. Kolehma noted Plaintiff could ambulate without a cane, but should ambulate with a cane in her left hand for comfort and increased speed of walking. *Id.* She stated Plaintiff should avoid stairs and ladders. *Id.* She indicated Plaintiff should limit standing and walking to 15 minutes at one time. *Id.*

On August 14, 2019, state agency psychological consultant Holly Hadley, Psy.D. ("Dr. Hadley"), reviewed the record and completed a psychiatric review technique ("PRT"), considering listings 12.04 for depressive, bipolar, and related disorders and 12.06 for anxiety and obsessive-compulsive disorders. Tr. at 49–51. She assessed mild limitations in Plaintiff's ability to adapt or manage oneself and moderate limitations in her abilities to understand, remember, or apply information, interact with others, and concentrate, persist, or maintain pace. Tr. at 50. She considered Plaintiff "able to perform simple, repetitive work tasks in settings that do not require ongoing interaction with the public." Tr. at 51. She completed a mental residual functional capacity ("RFC") assessment, finding Plaintiff

moderately limited in her abilities to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and interact appropriately with the general public. Tr. at 55–57. Dr. Hadley concluded the record contained insufficient evidence to assess Plaintiff's mental functioning at the time of her date last insured for DIB. Tr. at 67.

State agency medical consultant Stacie Weil, M.D. ("Dr. Weil"), reviewed the record on September 19, 2019, and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to extreme cold, extreme heat, and hazards. Tr. at 52–55. Dr. Weil assessed a similar RFC for the period prior to Plaintiff's DLI, except that she indicated lesser postural restrictions. *Compare* Tr. at 52–55, *with* Tr. at 68–71.

On December 17, 2019, a second state agency psychological consultant, R. Warren, M.D. ("Dr. Warren"), reviewed the record and completed a PRT,

considering listings 12.04 and 12.06, and assessing the same degree of limitation and mental RFC as Dr. Hadley for the current period. *Compare* Tr. at 49–51 *and* 55–57, *with* Tr. at 83–85 *and* 93–65. Like Dr. Hadley, Dr. Warren concluded the record contained insufficient evidence to assess Plaintiff's mental functioning prior to her DLI. *Compare* Tr. at 67, *with* Tr. at 107–08.

A second state agency medical consultant, Stephen Burge, M.D. ("Dr. Burge"), assessed the same physical RFC for the current period as Dr. Weil on December 23, 2019. *Compare* Tr. at 52–55, *with* Tr. at 88–91. He also assessed the same RFC as Dr. Weil for the period prior to Plaintiff's DLI. *Compare* Tr. at 68–71, *with* Tr. at 91–93.

On October 9, 2020, Plaintiff complained of low-back pain that was worse on the right and right hip/groin pain with right lower extremity weakness. Tr. at 1040. She described daily pain that prevented her from sleeping at night. *Id.* Dr. Ulmer observed Plaintiff to demonstrate a slow, antalgic gait with use of a cane and to use her arms to get in and out of a chair. *Id.* He noted TTP over the right-greater-than-left spinous muscles, limited ROM due to pain, 4/5 motor strength in multiple muscles of the right lower extremity, 5/5 strength in the left lower extremity, negative SLR, intact sensation, and increased pain with minimal hip external rotation. *Id.* He assessed pain in the right hip, other chronic pain, and low-back pain. *Id.* He

prescribed Celebrex 100 mg twice a day and ordered an orthopedic consultation for back and hip pain generators. *Id.*

Plaintiff returned to Dr. Ulmer on October 19, 2020. Tr. at 1044. She reported pain in her right hip/trochanteric region with weight bearing and movement and aching and numbness along the anterolateral right thigh and occasionally involving the medial right calf. *Id.* She said she was unable to stand and return to gainful employment. *Id.* Dr. Ulmer observed that Plaintiff used a cane in her left hand to help with ambulation. *Id.* He noted diffuse TTP of the paravertebral musculature, forward flexion of the lumbar spine to 30 degrees with pain, extension of the lumbar spine to zero degrees with pain, rotation of the lumbar spine to 20 degrees bilaterally, lateral bending of the lumbar spine to 10 degrees bilaterally with pain, SLR to 90 degrees bilaterally, positive Patrick's sign on the right, moderate trochanteric point tenderness on the right, 5/5 motor strength throughout, normal reflexes, inability to tandem walk, and limping gait. *Id.* He assessed intractable pain involving the right hip/limb girdle region, possible meralgia paresthetica, and pain/numbness suggestive of femoral neuropathy. Tr. at 1045. He referred Plaintiff to a spinal pain clinic for injections or consideration of a spinal cord stimulator trial and ordered a transcutaneous epidural nerve stimulation ("TENS") unit. *Id.*

Plaintiff followed up for low-back pain on February 2, 2022. Tr. at 1052. She indicated she was unable to sit or stand for very long and had to alternate between the two. *Id.* She reported an upcoming appointment with a neurosurgeon and indicated she needed an updated MRI prior to the appointment. *Id.* Paul Deaton, M.D. ("Dr. Deaton"), observed Plaintiff to be tender over her right posterior iliac crest and upper right femur, especially in the greater trochanter, and to walk with a cane, favoring her right side. Tr. at 1053. He ordered an MRI of Plaintiff's lumbar spine. *Id.*

On February 9, 2022, an MRI of Plaintiff's lumbar spine showed no disc herniation or stenosis in the lumbar spine and very mild lumbar degenerative changes that were similar to those indicated on the 2017 MRI. Tr. at 1219.

On February 14, 2022, Plaintiff reported pain in her low back and right hip and described an icepick-like stabbing in her right hip if she walked for too long, reliance on a cane for weight-bearing and balance, and difficulty moving, standing, sitting, walking, and lying down. Tr. at 1094. She endorsed depression, panic attacks, and anxiety. Tr. at 1095. Clinical physician assistant Taylor J. Callinan noted TTP of the right hip, significant pain with right hip ROM, positive FABER test, TTP of the right SI joint, 4/5 strength at the right psoas and quadriceps muscles, and antalgic gait with cane. Tr. at

1096. He assessed lumbar degenerative disc disease and right hip pain and referred Plaintiff to an orthopedic hip specialist. *Id.*

Plaintiff presented to orthopedist Robert J. Schoderbek, M.D. ("Dr. Schoderbek"), for evaluation of right hip pain on March 8, 2022. Tr. at 1089. She reported sharp, throbbing pain in all aspects of her right hip that had been ongoing since 2017. *Id.* She indicated the pain was exacerbated by walking and weight-bearing and remained present when she was sitting, standing, and lying down. *Id.* Dr. Schoderbek noted reduced ROM of the right hip and positive impingement and hip scouring. Tr. at 1090. He ordered an MRI arthrogram of Plaintiff's right hip. Tr. at 1092.

On March 18, 2022, Plaintiff reported her right hip pain was disrupting her sleep and bothering her for most of the day. Tr. at 1054. She requested Flexeril, as it had helped her with pain and sleep in the past. *Id.* David Peterseim, M.D. ("Dr. Peterseim"), noted pain and markedly decreased internal and external rotation of the right hip. Tr. at 1055. He prescribed Flexeril 10 mg. *Id.*

On March 28, 2022, the MRI arthrogram of Plaintiff's right hip showed increased intra-articular pressure and probable capsular thickening, morphologic irregularity of the superior labrum, consistent with chronic labral tear and degeneration, mild osteoarthritis, and gluteal and hamstrings tendinosis. Tr. at 1083–84.

Plaintiff continued to report pain with prolonged standing, walking, sitting, or lying down on March 29, 2022. Tr. at 1083. Dr. Schoderbek reviewed the MRI arthrogram and observed reduced ROM of the right hip to forward flexion, abduction, and internal and external rotation, as well as positive impingement and hip scouring. Tr. at 1085. He assessed a degenerative tear of the acetabula labrum of the right hip and recommended conservative treatment with right intra-articular hip and SI joint injections and physical therapy. Tr. at 1087.

Derrick Randall, M.D. ("Dr. Randall"), administered a right intra-articular hip injection on May 12, 2022. Tr. at 1173.

Plaintiff returned to Dr. Schoderbek following six weeks of physical therapy on June 21, 2022. Tr. at 1078. She indicated neither physical therapy nor the right hip injection had been beneficial, but the SI injection had decreased her groin pain. *Id.* She endorsed radicular pain to her right ankle, sleep disturbance due to pain, and use of a cane outside her home. *Id.* Dr. Schoderbek noted forward flexion of the right hip to 120 degrees, abduction to 45 degrees, external rotation to 45 degrees, and internal rotation to 20 degrees. Tr. at 1079. He recorded some mild TTP and positive right hip impingement and scouring. Tr. at 1079–80. He indicated the injections did not provide an explanation for the source of Plaintiff's pain, and he planned

to pursue injections to the greater trochanter and iliopsoas bursa. Tr. at 1081. He advised Plaintiff to continue with physical therapy. *Id.*

Dr. Randall administered a right SI joint injection on June 6, 2022. Tr. at 1132. On July 5, 2022, Jay B. Robards, M.D., administered a right iliopsoas injection. Tr. at 1098.

On August 9, 2022, Dr. Schoderbek noted Plaintiff was using a cane for assistance and "walking with noticeable apprehension." Tr. at 1117. Plaintiff reported her last injection had helped with throbbing and sharp pain, but she continued to experience general discomfort around her hip. Tr. at 1117–18. Dr. Schoderbek noted mildly-positive TTP, some reduced ROM, and positive impingement, hip scouring, and figure-4-position tests in the right hip. Tr. at 1119. He indicated they had exhausted conservative measures, and Plaintiff was not ready to proceed with surgery. Tr. at 1121. He advised Plaintiff to continue her home physical therapy exercises and use of nonsteroidal anti-inflammatory drugs. *Id.*

On October 25, 2022, Plaintiff reported her hip had improved slightly since the last injection, but continued to throb and ache daily. Tr. at 1110. Dr. Schoderbek noted mild TTP at the right iliotibial band, greater trochanter, and gluteus medius/minimus, reduced ROM of the right hip, mildly antalgic gait, ambulation with a cane, and positive impingement sign and mildly positive hip scouring on the right. Tr. at 1110–11. He assessed tear of the

right acetabular labrum, primary osteoarthritis of the right hip, right trochanteric bursitis, and right hip femoroacetabular impingement. Tr. at 1111. Dr. Schoderbek indicated they had exhausted all conservative measures and that the next opinion would be right hip arthroplasty with acetabular labral repair, shaving chondroplasty, and femoral osteochondroplasty. Tr. at 1112. Plaintiff stated she was not yet ready to proceed with surgery and planned to follow up in January to discuss it further. *Id.* Dr. Schoderbek advised Plaintiff that she would need to discontinue cigarette use for at least a month prior to and three months after surgery. *Id.*

     C.     The Administrative Proceedings

          1.     The Administrative Hearing

               a.     Plaintiff's Testimony

                    i.     September 11, 2020

At the first hearing, Plaintiff testified she was 5'3" tall and weighed 120 pounds. Tr. at 33. She indicated she had a driver's license and could drive short distances. *Id.* She said she could read and write, but often had to reread things because she had dyslexia. *Id.* She denied having worked since January 1, 2017. *Id.*

Plaintiff stated she last worked part-time as a gate guard for Charleston County Park. Tr. at 33–34. She testified she had previously worked six hours a day, five days a week at Ruby Tuesday. Tr. at 34.

Plaintiff testified she was unable to work due to pain related to bending, walking, turning, and lifting. *Id.* She stated she had "lost of a lot of muscle." *Id.* She indicated she had difficulty focusing and concentrating. *Id.* She described pain in her right hip and lower back. *Id.* She said she was no longer taking medication, as she had tried multiple medications that were ineffective and caused liver damage. *Id.* She stated she would "deal with the pain" and "cry throughout the day." *Id.* She denied being under medical treatment. *Id.*

Plaintiff testified she could sit for six or seven minutes, prior to needing to shift positions. Tr. at 35. She said she could stand for 10 to 15 minutes at a time. *Id.* She estimated she could walk for "20 feet maybe" on level ground. *Id.* She said she had received treatment for psychological problems following her father's death in 2013. *Id.* She indicated her doctor had taken her off medication for her mental health during the prior year. Tr. at 35–36.

Plaintiff said she lived alone in a house and managed her own personal care, except that she could not bend to shave her legs. Tr. at 36. She testified she could dust, sweep, use the dishwasher, and take clothes to the washer in multiple trips, but could not do it all in one day. *Id.* She said she could shop

for light items and had to stop often while doing so. *Id.* She indicated she spent her days watching television and people-watching while sitting outside. Tr. at 37.

Plaintiff testified she had left her job in 2012 to care for her father prior to his death. *Id.* She said her father had sustained several falls and reached a point where he could no longer be left alone. *Id.* She stated she did everything for her father prior to his death, including bathing him and transporting him to medical visits. *Id.*

Plaintiff stated she still experienced some pain in her neck, but her hip pain was worse. *Id.* She said she had right shoulder pain, but could treat it with ice and a change of position. Tr. at 38. She said she was right-handed. *Id.* She indicated she had felt pain over a two-year period due to fractured ribs, but they had healed. *Id.*

Plaintiff testified she ate only once a day, sat in the dark often, and did not call or speak with anyone unless the other person reached out first. *Id.* She said her lack of insurance and inability to afford medical treatment prevented her from seeing a doctor. *Id.* She indicated she had used an inheritance from her father to cover her living expenses until she returned to work in 2016. *Id.* She said a boyfriend supported her financially in 2017, but left her in 2018. Tr. at 39. She stated she subsequently had a roommate, who helped with expenses until she discovered he was stealing from her and

evicted him. *Id.* She noted she had used federal stimulus money to meet her expenses, and her daughter had helped her most recently. *Id.* She indicated she was still a patient at the free clinic, but had not been there since the start of the pandemic. *Id.* She said the free clinic would not see her while her personal injury lawsuit related to the January 2017 car accident was pending. *Id.* She indicated the case had settled two weeks prior, and she was scheduled to return to the free clinic on September 24. *Id.*

### ii.    December 6, 2022

At the second hearing, Plaintiff testified she was 5'3" tall and weighed 138 pounds. Tr. at 831. She confirmed that she had a driver's license and was able to drive short distances. *Id.* She denied having ever performed full-time work. *Id.* She said she had lost muscle mass and continued to have low back pain that caused difficulty bending, lifting, and walking. Tr. at 831–32. She stated it hurt to do anything for 20, 30, or 40 minutes and therapy had not been helpful. Tr. at 832. She said she was only taking muscle relaxers because pain medication had been ineffective and made her feel "woozy." *Id.*

Plaintiff indicated she had obtained treatment at Barrier Island and through the Roper System since the last hearing. *Id.* She said her doctor had administered an injection to her hip that had cut her pain in half. Tr. at 833. She stated she had participated in physical therapy for 12 weeks and continued to do the home exercises, but was still unable to stand, sit, or walk

for up to an hour. *Id.* She testified she was no longer seeing the orthopedist. *Id.*

Plaintiff estimated she could sit for 20 minutes, but would need to move and lean while sitting. *Id.* She said she could stand for maybe 30 to 40 minutes, but not in one spot. *Id.* She stated she could walk 10 to 15 steps before she would need to stop. *Id.* She indicated she could lift a gallon of milk, but not to chest-level. *Id.* She denied side effects from her current medications. *Id.* She said she had not received treatment for any psychological problems since 2018. Tr. at 834.

Plaintiff testified she lived in a house with her two dogs. *Id.* She said she was able to shower, dress, and care for her personal needs. *Id.* She indicated she performed household chores a "little at a time" and would lie down or rest in between tasks. *Id.* She confirmed that she shopped for groceries, but said she did not buy a lot at one time. *Id.* She said she changed positions frequently throughout a typical day, standing to do her physical therapy exercises and during commercial breaks while watching television and letting her dogs in and out. *Id.*

Plaintiff indicated her abilities to sit, stand, and walk had not changed much over the last couple of years. Tr. at 835. She confirmed she had received a lot of recent treatment for her right hip. *Id.* She said she was experiencing problems with her hip in 2017, but her pain had increased over time,

particularly after her back surgery. *Id.* She stated she experienced constant hip pain when she walked. *Id.* She clarified that when she indicated she had lost muscle mass, she meant she had lost strength. Tr. at 836. She said she could no longer do the things she had previously been able to do. *Id.* She indicated her daughter would bring over bags of dog food because she could not lift them. *Id.*

Plaintiff denied doing activities outside her home, aside from shopping for groceries and visiting her doctors. *Id.* She said "nobody ask[ed]" her to participate in activities because she was "a Debbie downer" and could not do things like go to the mall or walk on the beach. Tr. at 837. She confirmed that she would lean on a cane while walking. *Id.*

b.    Vocational Expert Testimony

i.    September 11, 2020

Vocational Expert ("VE") Mark A. Stebnicki, Ph.D., reviewed the record and testified at the hearing. Tr. at 40–41. The ALJ noted Plaintiff had not performed any job at the SGA-level over the prior 15-year period. Tr. at 40. He described a hypothetical individual of Plaintiff's vocational profile who could perform light work requiring no climbing of ladders or scaffolds; occasional climbing of ramps and stairs, balancing, kneeling, crouching, and crawling; frequent stooping; no exposure to work hazards; concentration sufficient in two-hour increments to perform simple, repetitive tasks;

occasional and casual contact with the general public; and occasional changes in work setting and procedure. The VE testified the hypothetical individual could perform light work with a specific vocational preparation ("SVP") of 2 as a stock checker, *Dictionary of Occupational Titles* ("*DOT*") No. 222.687-010, a dry cleaner, *DOT* No. 589.685-038, and a housekeeper, *DOT* No. 323.687-014, with 73,000, 41,000, and 454,000 positions in the national economy, respectively. Tr. at 40–41. The VE confirmed his testimony was consistent with the *DOT*. Tr. at 41.

### ii.    December 6, 2022

VE Sheila Cappizi testified at the second hearing. Tr. at 837–39. The ALJ described an individual of Plaintiff's vocational profile who could perform light work requiring no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, kneeling, crouching, crawling, and stooping; no exposure to work hazards; and understanding, remembering, and carrying out instructions for the performance of simple, repetitive tasks with customary breaks, occasional and incidental contact with the general public, and occasional changes in work setting and procedure. Tr. at 838. He asked the VE if she could identify jobs consistent with those limitations. *Id.* The VE testified the individual would be able to perform light work with an SVP of 2 as a marker, *DOT* No. 209.587-034, a routing clerk, *DOT* No. 222.687-022, and a router, *DOT* No. 222.587-038,

with 136,783, 117,987, and 25,136 positions in the national economy,
respectively. *Id.*

The ALJ asked the VE if her testimony had been consistent with the
*DOT.* Tr. at 838–39. The VE explained that interaction with the public and
types of climbing were not addressed in the *DOT*, but her testimony was
otherwise consistent with it. Tr. at 839.

### 2.    The ALJ's Findings

In his decision dated December 23, 2022, the ALJ made the following
findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social
     Security Act through March 31, 2018.
2.    The claimant has not engaged in substantial gainful activity
     since January 1, 2017, the alleged onset date (20 CFR 404.1571
     *et seq.*).
3.    Since the alleged onset date of disability, January 1, 2017, the
     claimant has had the following severe impairments: degenerative
     disc disease; degenerative joint disease; anxiety; and depression
     (20 CFR 404.1520(c) and 416.920(c)).
4.    Since January 1, 2017, the claimant has not had an impairment
     or combination of impairments that meets or medically equals
     the severity of one of the listed impairments in 20 CFR Part 404,
     Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,
     416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, I find that since
     January 1, 2017, the claimant has the residual functional
     capacity to perform light work as defined in 20 CFR 404.1567(b)
     and 416.967(b). Specifically, the claimant can lift up 20 pounds
     occasionally and 10 pounds frequently and stand, walk and sit for
     6 hours each in an 8-hour work day. The claimant can never
     climb ladders, ropes, or scaffolds; however, she can occasionally
     climb ramps and stairs, as well as occasionally balance, kneel,
     crouch, crawl, and stoop. The claimant must have no exposure to
     work hazards. Additionally, she can understand, remember, and

34

carry out instructions for the performance of simple, repetitive tasks with customary breaks. She is limited to only occasional and incidental contact with the general public, as well as only occasional changes in the work setting/procedure.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. On April 18, 2021, the claimant's age category changed to an individual of advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education but she is able to read and write (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Prior to April 18, 2021, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. Beginning on April 18, 2021, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

12. The claimant was not disabled prior to April 18, 2021, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

13. The claimant was not under a disability within the meaning of the Social Security Act at any time through March 31, 2018, the date last insured (20 CFR 404.315(a) and 404.320(b)).

Tr. at 801–17.

## II.    Discussion

Plaintiff alleges substantial evidence does not support the ALJ's RFC assessment.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing SGA. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h, 416.920(h)

claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are

supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Plaintiff argues the ALJ failed to comply with the court's direction in its prior order. [ECF No. 8 at 11]. She maintains the ALJ did not explain how the evidence supported a finding that she could perform light work and did not consider her qualifying statements as to her ability to engage in ADLs. *Id.* at 12. She asserts the ALJ failed to address her ability to perform the specific functions required for light work and did not address consistent exams showing pain and limited ROM of her neck, hips, and lower back and a record documenting increasingly-aggressive treatment. *Id.* at 12–14. She contends the evidence does not support the ALJ's conclusion that a "successful" surgery alleviated her suffering. *Id.* at 14. She claims her ADLs supported her assertion that she was limited to a narrow range of sedentary work. *Id.* at 15. She maintains the ALJ was required to assess her subjective complaints based on the record as a whole, not just the objective evidence. [ECF No. 11 at 1–2].

The Commissioner argues substantial evidence supports the ALJ's RFC assessment. [ECF No. 10 at 9]. She maintains the ALJ considered all evidence pertaining to each of Plaintiff's impairments and provided a logical explanation for the RFC assessment. *Id.* at 10–11. She contends the ALJ thoroughly discussed Plaintiff's subjective complaints, compared them to the

objective medical record, and concluded the record failed to corroborate the severity of her allegations. *Id.* at 11–12.

The RFC assessment must be based on all the relevant evidence in the case record. SSR 96-8p, 1996 WL 374184, at *2. Such evidence includes the claimant's medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of ADLs; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributed to a medically-determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at *5. The ALJ must include a narrative discussion referencing medical and non-medical evidence and explaining the restrictions included in the RFC assessment. *Id.* at *7.

The ALJ must evaluate the claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms based on the rules in 20 C.F.R. § 404.1529 and § 416.929 and SSR 16-3p. "[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce

the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). If the ALJ concludes the impairment could reasonably produce the symptoms the claimant alleges, he is to proceed to the second step, which requires him to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)).

The second determination requires the ALJ to consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). In undertaking this inquiry, the ALJ should consider "statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms, including agency personnel," as well as the following factors:

(1)     the claimant's ADLs;

(2)     the location, duration, frequency, and intensity of the claimant's pain or other symptoms;

(3)     any precipitating or aggravating factors;

(4)     the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

(6)    any measures the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(7)    other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 2017 WL 5180304, at *6.

The ALJ must explain which of the claimant's alleged symptoms he considered "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." SSR 16-3p, 2017 WL 5180304, at *8. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. The ALJ must "build an accurate and logical bridge" between the evidence and his conclusion as to the intensity, persistence, and limiting effects of the claimant's symptoms. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

"[A] proper RFC analysis has three components: (1) evidence; (2) logical explanation; and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). The logical explanation should reflect how the ALJ weighed the evidence and arrived at the RFC finding. *Id.* "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant

functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (citing *Cichocki v. Astrue*, 729 F.3d 177 (2d Cir. 2013)).

The ALJ found Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) and could specifically "lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours each in an 8-hour work day." Tr. at 807. He further found she could "never climb ladders, ropes, or scaffolds," but could "occasionally climb ramps and stairs, as well as occasionally balance, kneel, crouch, crawl, and stoop. *Id.*

The ALJ wrote: "The medical evidence of record indicates that while the claimant received treatment for her severe impairments before the established onset date, the claimant's symptoms were not as limiting as she alleged." Tr. at 808. He determined Plaintiff's medically-determinable impairments could reasonably be expected to cause "some of the alleged symptoms of back and hip pain," but her statements "concerning the intensity, persistence, and limiting effects" of her symptoms were "not fully supported." Tr. at 813. He explained:

> Specifically, the medical records reveal that the claimant's back surgery was successful. While the claimant displayed some weakness in the right lower extremity and a slightly antalgic gait at some examinations of record, there is no evidence of positive

straight leg raising tests beginning in late 2018 following her lumbar decompression surgery. A number of physical examinations have indicated no atrophy in the lower extremities, which one would expect with the degree of inactivity alleged by the claimant. At the July 2019 consultative physical evaluation with Dr. Kolehma, the claimant reported that her lumbar surgery helped her upper back pain despite continued pain in her right buttock, groin, and hip. Upon examination, the claimant exhibited an antalgic gait, loss of lumbar lordosis, 4/5 right hip strength, and tenderness to palpation of the right hip; otherwise, she exhibited a normal range of motion and strength in all other joints, a normal range of motion throughout the spine, a negative straight leg raising test, intact sensation, 2+ reflexes, and no edema. While the claimant complained of lower back pain and displayed slightly decreased lumbar range of motion and mild right lower extremity weakness through early 2021, subsequent examination notes showed improvement in the claimant's lumbar symptoms. (Exhibits 7F, 9F, 11F, and 12F).

There was a large gap in treatment after January 2021 until a return to treatment in February 2022. The more recent medical evidence from 2022 primarily documented right hip complaints rather than lower back complaints. Notably, the right hip MRI findings of record showed only mild to moderate degenerative changes of the bilateral hips and mild right labral fraying. (Exhibits 7F, 9F, 12F, 13F, and 14F). The claimant was treated with a series of right hip injections. She continued to complain of lower extremity pain despite some benefit from the injections and she was consistently described as walking with a cane. However, the recent March and June 2022 orthopedic examinations documented the claimant's normal strength in all muscle groups and a normal gait and station. While the claimant displayed a mildly antalgic gait at the October 2022 visit, her right hip strength remained intact at the August and October 2022 visits. Furthermore, the claimant continually declined right hip surgery options despite expressing dissatisfaction with conservative treatment measures. There was no evidence of recommendations for further lumbar surgery and the claimant was advised that there were no significant lumbar MRI findings to explain her lower back pain. (Exhibits 13F and 14F). The record documents 4/5 right lower extremity strength, a slightly antalgic gait, and limitations in the lumbar and right hip range of motion;

otherwise, the remainder of the physical examinations were relatively normal. Such evidence more than supports the finding that the claimant could perform the sitting, standing, walking, lifting, and carrying requirements of light exertional work with the additional postural and environmental restrictions above. I find that the claimant's subjective complaints of ongoing, significant back problems and debilitating right hip symptoms are inconsistent with the objective findings of record.

*Id.*

The ALJ also explained his consideration of Plaintiff's ADLs as follows:

Additionally, the claimant testified and/or reported in the record that she was able to live independently, live with a roommate at times, bathe and dress independently, use a microwave oven, drive a motor vehicle, shop for groceries, do laundry, perform household chores at her own pace, spend time with friends, read a newspaper, perform simple arithmetic calculations, and manage her finances. At the June 2019 consultative evaluation, she stated that on good days, she was capable of loading and unloading the dishwasher, dusting, and sweeping. (Exhibits 6E and 10F). Overall, these activities, when viewed in conjunction with the other inconsistencies regarding the claimant's allegations of pain and dysfunction, further limit the claimant's persuasiveness in discussing her symptoms. Having considered all of the above, I find that the claimant's allegations of a total inability to work are overstated and unsupported by the medical evidence of record prior to the established onset date.

Tr. at 814.

In *Woods v. Berryhill*, 888 F.3d. 686, 694 (4th Cir. 2018), *superseded by statute on other grounds*, the court considered an ALJ's discussion of his finding that the claimant could perform medium work and rejected it, explaining:

The ALJ concluded that Woods could perform "medium work" and summarized evidence that he found credible, useful, and

consistent. But the ALJ never explained how he concluded—
*based on this evidence*–that Woods could actually perform the
tasks required by "medium work," such as lifting up to 50 pounds
at a time, frequently lifting or carrying up to 25 pounds, or
standing and walking for six hours. See SSR 83-10, 1983 WL
31251, at *6 (Jan. 1, 1983). The ALJ therefore failed to build an
"accurate and logical bridge" from the evidence he recounted to
his conclusion about Woods's residual function[al] capacity.

This ALJ similarly failed to build the requisite "accurate and logical bridge"

between the evidence and his conclusion that Plaintiff could perform light

work.

Although the ALJ summarized some of the physical exam findings

following Plaintiff's back surgery and stated "[s]uch evidence more than

supports the finding that the claimant could perform the sitting, standing,

walking, lifting, and carrying requirements of light exertional work with the

additional postural and environmental restrictions," he failed to explain how

the evidence supported such a conclusion. The above excerpts from the ALJ's

decision reflect his consideration of both positive and negative objective

findings, but he failed to reconcile his conclusion that the overall evidence

supported an RFC for light work. The ALJ did not indicate how the

"otherwise . . . normal" findings he referenced supported Plaintiff's ability to

lift and carry up to 20 pounds occasionally and 10 pounds frequently and sit,

stand, and walk for six hours each in an eight-hour workday, despite her

reports of pain to her providers, a recommendation for hip surgery, and

findings of "4/5 right lower extremity strength, a slightly antalgic gait, and limitations in the lumbar and right hip range of motion." *See* Tr. at 813.

The ALJ failed to explain how Plaintiff's limited ADLs, performed at her own pace, demonstrated her ability to perform light work over the course of an eight-hour workday. *See Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 101 (4th Cir. 2020) (declaring the ALJ "failed to adequately explain how [the claimant's] limited ability to carry out daily activities supported his conclusion that she could sustain an eight-hour workday"). In *Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 263 (4th Cir. 2017), the court found the ALJ erred in providing no explanation to support a finding that activities of "cooking, driving, doing laundry, collecting coins, attending church and shopping" showed the claimant "could persist through an eight-hour workday."

The ALJ recognized Plaintiff's allegation that she required flexibility in performing ADLs, but he did not reconcile her need for flexibility with the RFC assessment. The Fourth Circuit has explained that "[a] claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with [her] ability to carry out daily activities," as "the critical difference between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum

48

standard of performance, as [she] would be by an employer." *Arakas*, 983 F.3d at 101 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).

The ALJ placed undue emphasis on the objective evidence, as he specifically found "the claimant's subjective complaints of ongoing, significant back problems and debilitating right hip symptoms are inconsistent with the objective findings of record." Tr. at 813. Because the ALJ acknowledged the objective medical evidence showed conditions that could reasonably produce the symptoms Plaintiff alleged, Tr. at 813, he was not permitted to reject her allegations as to the intensity, persistence, and limiting effects of her symptoms based on the objective evidence, and was required to consider whether her statements were generally consistent with the other evidence of record. *See* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)

The ALJ's characterization of Plaintiff's back surgery as "successful" fails to accurately represent the record and consider her statements to her providers. Although Plaintiff reported some improvement in her upper back pain following surgery, she continued to report persistent pain in her right lower back, hip, and anterior thigh and to pursue various treatment options with multiple providers throughout the relevant period. *See* Tr. at 736, 738, 740, 742, 792, 1040, 1044, 1089, 1094. "Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources

may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." SSR 16-3p, 2017 WL 5180304, at *9.

The ALJ erred in citing Plaintiff's failure to pursue hip surgery and a gap in medical treatment as reasons for finding her statements inconsistent with the evidence without further developing the issues. An ALJ is not permitted to "find an individual's symptoms inconsistent with the evidence in the record" based on the extent of treatment sought or a failure to follow treatment that might improve symptoms "without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p, 2017 WL 5180304, at *9. At the first hearing, Plaintiff testified she had been unable to afford treatment on her own and the free clinic would not see her because she was involved in litigation over a car accident. *See* Tr. at 39. The ALJ's decision does not reflect his consideration of Plaintiff's explanation. A "claimant may not be penalized for failing to seek treatment she cannot afford; 'it flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain treatment that may help him.'" *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1985) (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984)). As for Plaintiff's failure to undergo hip surgery, she did not reject surgery, but sought to delay

it. This was not unreasonable given her need to stop smoking for one month prior to surgery.

In the prior order, the court found:

The ALJ failed to address relevant evidence and cited irrelevant evidence in evaluating Plaintiff's statements, resulting in an erroneous evaluation of the intensity, persistence, and limiting effects of her impairments. He failed to specifically address and resolve evidence as to Plaintiff's ability to perform functions required for light work and did not adequately explain how the evidence supported his RFC assessment.

Tr. at 908. The same problems plague this decision. Therefore, the court finds the ALJ's decision lacks the support of substantial evidence.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

*Shiva V. Hodges*

October 10, 2023                          Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge